COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Friedman and Callins
Argued at Leesburg, Virginia


LAVONNIA BROWN, ET AL.
                                                    MEMORANDUM OPINION* BY
v.        Record No. 0491-23-4                      JUDGE DOMINIQUE A. CALLINS
                                                         APRIL 16, 2024
SHARON JOHNSON, ET AL.


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Stephen C. Shannon, Judge

Joseph W. Stuart for appellants.

John F. Rodgers for appellee Sharon Johnson.

No brief or argument for other appellees.


LaVonnia[1] Brown and Sylvia Stovall challenge the trial court's order concerning a house in

which Sharon Johnson had a life estate.  LaVonnia and Sylvia contend that the trial court erred in

ruling that they were not the remainder beneficiaries of the life estate.  They also argue that the trial

court erred by finding that Sharon used the estate house as her personal residence.  Finding no

error, we affirm the trial court's judgment.

BACKGROUND[2]

Mary S. Putnam executed a will, dated November 4, 1998, Article III of which provided:

> (a) If my sister and her husband, [Anna and Clarence Johnson], and
> their daughter, [Sharon Johnson], survive me, I devise my house . . .

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Although spelled both "Lavonnia" and "LaVonnia" on brief, we adopt the latter
spelling, as it is the one used most consistently by the party in her brief.

[2] We state the facts in the light most favorable to Sharon, the prevailing party below.  *See*
*Edmonds v. Edmonds*, 290 Va. 10, 24 (2015).

to them until (i) the time of their death, or (ii) the expiration of a [90]-day period during which they have failed to use the premises as their personal residence, whichever shall first occur.

(b) During the course of this determinable life estate, [Anna, Sharon, and Clarence Johnson] shall be responsible for the payment of all charges incident to maintaining the property including, but not limited to (i) regular recurring taxes, (ii) ordinary repairs, and (iii) insurance premiums on a homeowner's insurance policy for the benefit of the remaindermen, as well as themselves, as their interests may appear.

(c) In the event that [Anna, Clarence, and Sharon Johnson] shall not survive me for a period of at least [30] days, then and in that event I give, devise and bequeath absolutely and in fee simple to my nieces, [LaVonnia Brown and Sylvia Stoval], the house . . . in equal shares, to share and share alike.

(d) It is my desire that the house . . . be kept in the family if possible and passed on to future generations to live in and enjoy.

Article VII(c) of the will provided that "the singular shall include the plural and vice versa."

Mary died in 2010, survived by Anna, Sharon, LaVonnia, and Sylvia. Anna's two other children—Sharon's siblings—Magaera and Reginald, also survived Mary, whereas Clarence predeceased Mary. Mary had executed an earlier will, dated February 26, 1992, that was admitted to probate in November 2011. LaVonnia, along with her husband and brother-in-law, qualified as executors of that earlier will. At that time, Anna, Magaera, and Reginald were living in the estate house.

Anna died in 2018. Reginald died in September 2020. Magaera continued living in the estate house. Sharon leased an apartment in Alexandria from February 2020 through the end of that year. She continued making payments on the apartment through December 2021, after which she apparently moved into the estate house full-time. Mary's 1998 will, which revoked the 1992 will, was admitted to probate on October 16, 2020.

In November 2021, LaVonnia and Sylvia filed a complaint for declaratory judgment seeking a judicial declaration that Sharon's life estate under the 1998 will had terminated because she failed

to use the estate house as her personal residence as required under the will. LaVonnia and Sylvia also sought a judicial declaration that they held the remainder interest in the house.

At trial, Sharon testified that after her brother Reginald died, she went "down to the house on weekends and cooked food" for Magaera, "sometimes two or three times a week." When she came to cook for Magaera, Sharon stayed in the estate house overnight or for the weekend. She kept a room in the house for her use, and it was the "same room" that she was living in at trial. Sharon denied renting the estate house "to strangers." She asserted that she made repairs to the house, and allowed her sister, Magaera, to live there. Magaera testified that Sharon slept at the house "quite a bit."

The trial court found that Sharon had used the house as her personal residence and ruled that Sharon's life estate had not terminated. The trial court interpreted Article III(c) of the 1998 will as containing a condition precedent that Clarence, Anna, and Sharon all die within 30 days of Mary's death for LaVonnia and Sylvia to acquire possession of the house. The trial court found that the condition precedent did not occur, and therefore ruled that LaVonnia and Sylvia did not take under Article III(c) of the 1998 will. Finally, the trial court interpreted the will as providing that upon the termination of Sharon's life estate, the residuary clause in Article IV(b) controlled disposition of the estate house. The trial court entered a final order on January 18, 2023. LaVonnia and Sylvia moved the trial court to reconsider its ruling, which motion the court denied. LaVonnia and Sylvia appeal to this Court.

ANALYSIS

LaVonnia and Sylvia challenge the trial court's interpretation of Article III of the 1998 will. Additionally, they assert that the evidence contradicted the trial court's finding that Sharon used the house as her personal residence.

I.  The trial court did not err in interpreting the parties' intents under the will.

LaVonnia and Sylvia argue that the trial court erred in ruling that they were not the remainder beneficiaries of the life estate created by Article III(a).  They contend that the trial court applied a liberal construction to Article III(a) to find that the survival condition was met and Sharon had a life estate, but applied a strict construction to Article III(c) to find that its survival condition was not met, and therefore that LaVonnia and Sylvia were not the remainder beneficiaries.

We review de novo a trial court's interpretation of a will's legal effect.  *Larsen v. Stack*, 298 Va. 683, 688 (2020).  "The 'cardinal principle' of will construction is that the intention of the testator controls."  *Id.* (quoting *Gillespie v. Davis*, 242 Va. 300, 303 (1991)).  "We must determine the intention of the testator from the language which he has used, and if the meaning of that language is plain, the will must be given effect accordingly."  *Id.* (quoting *Feeney v. Feeney*, 295 Va. 312, 317 (2018)).  To ascertain that intention, we examine "the whole will" and, as far as possible, give effect to all its parts.  *Id.* (quoting *Feeney*, 295 Va. at 317).  "Once ascertained, this intention serves 'as the polar star to guide and direct us.'"  *Feeney*, 295 Va. at 318 (quoting *Roller v. Shaver*, 178 Va. 467, 472 (1941)).

A.  *The will created a life estate for Sharon.*

LaVonnia and Sylvia argue that Article III(a) created a life estate for Sharon only if all the named individuals—Anna, Clarence, and Sharon—survived Mary.  They contend that because Clarence predeceased Mary, the survival condition was not met, and thus no life estate came into being.

In general, a life estate is "[a]n estate held only for the duration of a specified person's life, usu[ally] the possessor's."  *Larsen*, 298 Va. at 689 (alterations in original) (quoting *Life Estate, Black's Law Dictionary* (11th ed. 2019)).  "Conditional or executory limitations may be

- 4 -

placed on life estates." *Id.* A "determinable life estate" is one subject to a condition or limitation that terminates the life estate upon the occurrence of an event other than the death of the specified person. *See Landmark Commc'ns, Inc. v. Sovran Bank, N.A.*, 239 Va. 158, 164 n.3 (1990) (noting that the "if, then" clauses of a will provision permitting parties to inherit only subject to certain preconditions constituted a "determinable life estate"); *see also Determinable Estate, Black's Law Dictionary, supra* ("An estate that is defeasible by operation of a special limitation.").

By the terms of Article III(a), if Anna, Clarence, and Sharon survived Mary, the will devises the house "to them" until "the time of their death," subject to the special limitation that the life estate would terminate if they "failed to use the premises as their personal residence" for 90 days. Additionally, Article VII(c) of the will states that words in plural form must be understood as including the singular. Thus, Mary's use of the term "and" between the individuals named in Article III(a) does not require us to hold that she intended that they *all* must have survived her to create a life estate. *See East v. Garrett*, 84 Va. 523, 536 (1888) (citing with approval the proposition "that the words 'or' and 'and' are not, in deeds and wills, to be always held to a strict grammatical sense, but 'or' is to be taken for 'and,' and 'and' is to be taken for 'or,' as may best comport with the intent and meaning of the grant or devise" (quoting *Jackson ex dem. Burhans v. Blanshan*, 6 Johns. 54, 57 (N.Y. Sup. Ct. 1810)));[3] *cf. Potts v. Rader*, 179 Va.

---

[3] This principle of construction is neither new nor exotic, having been acknowledged by the Supreme Court of the United States as well as by various sister jurisdictions. *See Doe v. Watson*, 49 U.S. 263, 272 (1850) ("If the intent of the testator be apparent, effect will be given to it, though he may have used inappropriate terms to attain his object. Under such circumstances, the conjunctive 'and' may be read as the disjunctive 'or,' or the disjunctive may be changed into the conjunctive."); *State v. Yount*, 642 S.W.3d 298, 301-02 (Mo. 2022) ("[I]n order to effectuate the intention of the parties to an instrument, a testator, or a legislature, . . . the word 'and' is sometimes construed to mean 'or'. This construction, however, is never resorted to except for strong reasons and the words should never be so construed unless the context favors the conversion; as where it must be done in order to effectuate the manifest intention of the user; and where not to do so would render the meaning ambiguous, or result in an absurdity; or would be

722, 730 (1942) ("If the disjunctive 'or' is substituted for the conjunctive 'and' . . ., the dominant scheme of the disposition of the testatrix's property will be consummated . . . .  It simply explains what, on its face, appears to be a contradiction in the use of words and carries out the dominant intention gathered from the four corners of the will.").  Instead, we must determine her intent and interpret her wording to carry out that intent, if possible.  *Larsen*, 298 Va. at 688.  Plainly, the termination of the life estate upon "their death" does not refer to the simultaneous death of Anna, Clarence, and Sharon.  Instead, it must refer to the death of each named individual who survived Mary.

We hold that Article III(a) created a determinable life estate in each of the three named individuals who survived Mary.  Each life estate was subject to termination either at the death of the respective life tenant or the failure of the respective life tenant to use the house as a personal residence for 90 days.  Because Clarence predeceased Mary, no life estate came into existence for him.  Anna survived Mary and received a life estate that terminated with her own death in 2018.  Sharon also survived Mary and received a life estate, subject to the residency condition.

B.  *The will did not create a remainder interest in LaVonnia and Sylvia.*

LaVonnia and Sylvia contend that the trial court erred by ruling that they were not the remainder beneficiaries of the life estate created by Article III(a).  They argue that the trial court

---

tantamount to a refusal to correct a mistake." (emphasis omitted) (quoting *Hawkins v. Hawkins*, 511 S.W.2d 811, 813 (Mo. 1974))); *City of Schertz v. Tex. Comm'n on Env't Quality*, 653 S.W.3d 468, 475-76 (Tex. App. 2022) (same) (quoting *Bd. of Ins. Comm'rs of Tex. v. Guardian Life Inc. Co. of Tex.*, 180 S.W.2d 906, 908 (Tex. 1944)); *State v. Hill*, 157 So.2d 462, 464 (La. 1963) (same) (quoting *Bradford v. La. Pub. Serv. Comm'n*, 179 So. 442, 446 (La. 1938)); *In re Gulbenkian's Will*, 174 N.E.2d 481, 483 (N.Y. 1961) ("The inarticulate use of the word 'and' instead of 'or' is of no consequence in this text."); *Gibbes Mach. Co. v. Johnson*, 61 S.E. 1027, 1028 (S.C. 1908) ("If the context demands that the word 'and' should be construed 'or' in order to give effect to the intention of the parties, it will be so declared."); *Appeal of Doebler*, 64 Pa. 9, 14 (1870) ("It is unnecessary to consider now what the word 'heirs' means in this connection, because it is abundantly clear, both upon reason and authority, that the clause must be construed as if the conjunctive word 'and' were substituted for the disjunctive 'or' in the sentence.").

"could fairly construe the condition" in Article III(a) "as broader than the precise language," but only if it construed in Article III(c) "just as broadly . . . to provide the remainder interest in the house to LaVonnia and Sylvia." Finally, they argue that the canon of construction that a specific provision controls over a general provision compels the interpretation that the "specific provision" of Article III(c) makes them the remainder beneficiaries of the life estate and that the "general residuary clause" of Article IV(b) does not apply.

"[W]here there is an express limitation for life, or where the construction calls for an estate for life, the fact that there is no remainder does not affect the character of the estate." 1 Harrison on Wills & Administration for Va. & W. Va. § 19.13 (2022). "Where there is no remainder there is a reversion in favor of the estate of the testator." *Id.* "[A] reversion is the remnant of an estate *continuing in the grantor*, undisposed of, after the grant of a part of his interest." *Hamm v. Hazelwood*, 292 Va. 153, 162 (2016) (quoting *Copenhaver v. Pendleton*, 155 Va. 463, 477 (1930)). Thus, a grantor who creates a life estate by will, without identifying remaindermen, retains a reversion, which is a present vested estate with enjoyment in the future. *Id.*; 1 Harrison, *supra*, § 19.13; *Reversion*, *Black's Law Dictionary*, *supra*. By contrast, a remainder is a "future interest arising in a third person—that is, someone other than the estate's creator, its initial holder, or the heirs of either—who is intended to take after the natural termination of the preceding estate." *Remainder*, *Black's Law Dictionary*, *supra*; *see also Copenhaver*, 155 Va. at 477 ("A remainder is defined to be 'what is left' of an entire grant of lands or tenements after a preceding part of the same grant or estate has been disposed of in possession, whose regular expiration the remainder must await." (emphasis omitted) (quoting 1 Minor on Real Prop. (2d ed.), § 702, p. 916)). An example of language creating a remainder is "[T]o A for life, and then to B." *Remainder*, *Black's Law Dictionary*, *supra*. In this example, "B's future interest is a remainder." *Id.*

Here, Article III(a) of the will does not identify any remaindermen. Therefore, the will created a reversion in Mary's estate that vested upon Mary's death and would become possessory upon the termination of the life estate. LaVonnia and Sylvia argue that Article III(b) requires the life tenants to maintain insurance "for the benefit of the remainderman," and thus supports their claim of a remainderman interest. They contend that subsection c of Article III identifies the remainder beneficiaries.

Article III(c) does not create a remainder. Instead, it creates a contingent fee simple subject to the condition precedent that Anna, Clarence, and Sharon not survive Mary by at least 30 days. *See Mott v. Nat'l Bank of Com*., 190 Va. 1006, 1010-11 (1950) ("A remainder is vested when it is subject to no condition precedent, and is always ready, during its continuance, to come into the possession of a certain person, already existing and ascertained, on the determination of the particular estate, now or hereafter, in any manner whatsoever. And any remainder not so ready is contingent." (quoting Graves, Notes on Real Property, § 174, p. 201)). *See also Contingent Estate*, *Black's Law Dictionary*, *supra* ("An estate that vests only if a specified event does or does not happen."); *Fee Simple*, *id.* ("An interest in land that, being the broadest property interest allowed by law, endures until the current holder dies without heirs; esp[ecially], a fee simple absolute."); *Goin v. Absher*, 189 Va. 372, 379 (1949) ("A fee simple is an estate of perpetuity, and confers an unlimited power of alienation, and no person is capable of having a greater estate or interest in land." (quoting *Smith v. Smith*, 122 Va. 341, 352 (1918))). Both Anna and Sharon survived Mary for at least 30 days, and thus the triggering event for the contingent devise in Article III(c) failed to occur. As no triggering event occurred, LaVonnia and Sylvia have no property interest arising from Article III(c). Moreover, although Mary could have specifically designated LaVonnia and Sylvia as the remaindermen in Articles III(a) or III(c), she did not do so. *See Lane v. Starke*, 279 Va. 686, 689 (2010) (reciting a provision in a

testator's will that "[u]pon the death of my wife, she having survived me, or upon her remarriage, I give, devise and bequeath the property herein devised to her for her life or until her remarriage as follows" and listing two remainder beneficiaries).

LaVonnia and Sylvia also argue that interpreting the will to make the estate house part of Mary's residuary estate "would defeat the precatory request under" Article III(d) because the residuary clause in Article IV(b) will force the executor to sell the house. Yet Article III(d) merely expresses Mary's precatory desire and is not mandatory.[4] *See Carson v. Simmons*, 198 Va. 854, 859 (1957) (utilizing Black's Law Dictionary definition of "precatory words as 'Words of entreaty, request, desire, wish, or recommendation, . . . as distinguished from direct and imperative terms'"); *see also Gaymon v. Gaymon*, 258 Va. 225, 230-31 (1999) (discussing how "the context in which [the subject phrases] appear" distinguishes precatory intent from mandatory intent (citing *Carson*, 198 Va. at 858-59)). Precatory words will not be construed as mandatory "unless it appears that they were intended to create a legal obligation." *Carson*, 198 Va. at 859. And the defeat of precatory words does not, of necessity, give rise to a remainder interest where the intent to create a remainder interest does not otherwise exist.

For these reasons, the trial court did not err in ruling that Article III(c) did not create a remainder interest in LaVonnia and Sylvia.

II. The trial court did not err in finding that Sharon used the house as her personal residence.

A. *The trial court properly interpreted the term "personal residence."*

LaVonnia and Sylvia challenge the trial court's interpretation of the term "personal residence," arguing that the court erred by not giving the term its "ordinary meaning." They contend that the trial court should have interpreted Article III(a) to require that Sharon use the

---

[4] We express no opinion on whether Article IV(b) mandates that the executor sell the house upon the termination of Sharon's life estate, as that question is not before us in this appeal. *See Evans v. Evans*, 300 Va. 134, 151 (2021).

estate house as her "usual place of abode." They also contend that one's personal residence is "the place where one actually lives or has his home."

"We review de novo the [trial] court's interpretation of the legal effect of [a] will." *Larsen*, 298 Va. at 688. Again, the "cardinal principle" guiding us is that the testator's intent controls. *Id.* (quoting *Gillespie*, 242 Va. at 303). We determine that intent "from the language which he has used, and if the meaning of that language is plain, the will must be given effect accordingly." *Id.* (quoting *Feeney*, 295 Va. at 317). We presume that a testator used the words in her will "in their ordinary meaning." *Pitman v. Rutledge*, 198 Va. 567, 574 (1956).

Here, the will provided that the life estate would terminate if the life tenant did not use the house as his or her "personal residence" for 90 days. "Personal" is defined as "of or relating to a particular person." *Personal*, *Webster's Third New International Dictionary* (2002). "Residence" is defined as "the act or fact of dwelling in a place for some time," "an act of making one's home in a place," "the act or fact of living or regularly staying at or in some place," and "a building used as a home." *Residence*, *id.* Thus, "personal residence" refers to a dwelling place or home used by an individual in her personal capacity or not used commercially.

The term "residence" is without a universal definition in our law, and no such definition is available, since what constitutes a residence varies with context. *See*, *e.g.*, *Bergman v. Bergman*, 25 Va. App. 204, 213 (1997) (recognizing that, as "the length of time that a person lives at a particular location is but one factor that governs whether [a] person 'resides' at a location" a court must "look to the circumstances of each case to determine whether one person 'resides with' another"). LaVonnia and Sylvia urge this Court to equate the term "residence" with the term "domicile," which connotes an individual's "usual place of abode." But the terms "residence" and "domicile" are neither synonymous nor otherwise coextensive. Although a person may have multiple residences, and one of those residences may be a domicile, the term

"domicile" can be understood more limitedly to refer to "one's permanent and principal home." *Domicile*, *Webster's Third New International Dictionary*, *supra*; *see also State-Planters Bank & Trust Co. of Richmond v. Commonwealth*, 174 Va. 289, 295 (1940) ("Domicile and residence are not words of equivalent meaning.  One may have a residence at a place without having his domicile there.").  As this contrast implies, because "personal" is not synonymous with "primary" or "principal," a personal residence, unlike a domicile, need not be a *primary* or *principal* home.  *See State-Planters*, 174 Va. at 295 ("A person may have more than one residence, while [that person] can have only one domicile, -- a permanent place of abode -- at the same time, and at least for the same purpose.").  Further, describing a residence as "personal" distinguishes that residence from one that is used for commercial or business purposes.

Accordingly, nothing in either the will or the ordinary definitions of "personal" and "residence" requires one's "personal residence" to be the sole or exclusive place where one resides.[5]  Additionally, the term "usual place of abode" is most often used in the context of substituted service under Code § 8.01-296 and therefore is inapposite here.  *See* Code § 8.01-296(2)(a); *Koons v. Crane*, 72 Va. App. 720, 734 (2021) ("A person's 'usual place of abode' is distinct from his 'last home' or 'last known residence.'").  Accordingly, we hold that the term "personal residence" as used in the will required Sharon to use the house as a residence but did not require her to use it as her sole or exclusive residence.  Thus, the trial court did not err in its construction of the meaning of "personal residence."

---

[5] For example, the will did not use terms such as "domicile," "sole residence," "primary residence," or "principal residence."

B. *The trial court's finding that Sharon used the house as her personal residence is not plainly wrong or without evidence to support it.*

LaVonnia and Sylvia argue that the evidence contradicts the trial court's finding that Sharon used the house as her personal residence. They recite extensively from their own evidence at trial, as well as from the testimony of Sharon and Magaera, to support their contention that Sharon did not use the house as her personal residence. They argue that this evidence "simply does not support the finding that Sharon made the [h]ouse her personal residence."

This Court will not disturb the trial court's factual determinations unless "they are 'plainly wrong or without evidence to support [them].'" *Grayson v. Westwood Bldgs. L.P.*, 300 Va. 25, 58 (2021) (alteration in original) (quoting Code § 8.01-680). Given that we must view the evidence in the light most favorable to Sharon as the party prevailing below, we must "discard the evidence of [LaVonnia and Sylvia] which conflicts, either directly or inferentially, with the evidence" Sharon presented at trial. *Mayer v. Corso-Mayer*, 62 Va. App. 713, 728 (2014) (quoting *Petry v. Petry*, 41 Va. App. 782, 786 (2003)).

Here, the testimony at trial established that Sharon kept a room at the house, in which she stayed "two or three" nights a week. That room was the "same room" in which she was living at the time of trial. Sharon also allowed her sister, Magaera, to live in the house. Additionally, Sharon testified to making repairs on the house. Thus, the evidence shows that Sharon regularly stayed overnight at the house and maintained a room there for that purpose. Accordingly, in light of our conclusion above that a "personal residence" need not be one's sole or exclusive residence, the trial court's finding that Sharon used the house as her personal residence is not plainly wrong or without evidence to support it.

CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.[6]

*Affirmed.*

---

[6] Sharon has requested appellate attorney fees and costs. Whether to award attorney fees incurred on appeal is a discretionary decision. *Friedman v. Smith*, 68 Va. App. 529, 545 (2018); Rule 5A:30(b). Upon consideration of the record before us, we deny Sharon's request for attorney fees incurred on appeal.